# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Justin T. Quinn |
| v. | : | Mag. No. 25-6052 (JTQ) |
| HECTOR RIANO-CORCUERA | : | **CRIMINAL COMPLAINT** |

I, Asadullah Kakar, being duly sworn, state that the following is true and correct to the best of my knowledge and belief:

### SEE ATTACHMENT A

I further state that I am a Task Force Officer with the Drug Enforcement Administration, and that this complaint is based on the following facts:

### SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

/s/ Asadullah Kakar
Asadullah Kakar
Task Force Officer, Drug
Enforcement Administration

Attested to by telephone pursuant to
Fed. R. Crim. P. 4.1 on
June 27, 2025,
in the District of New Jersey

Hon. Justin T. Quinn
United States Magistrate Judge

**FILED**

JUN 2 7 2025

AT 8:30 _____M
CLERK, U.S. DISTRICT COURT - DNJ

## ATTACHMENT A

### COUNT ONE
(Distribution of Controlled Substances)

On or about June 26, 2025, in the District of New Jersey, and elsewhere, the defendant,

**HECTOR RIANO-CORCUERA**,

did knowingly and intentionally distribute and possess with the intent to distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance.

In violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A).

2

## **COUNT TWO**
(Felon in Possession of a Firearm)

On or about June 26, 2025, in the District of New Jersey, and elsewhere, the defendant,

**HECTOR RIANO-CORCUERA**,

knowing that he had previously been convicted of a crime punishable by a term of imprisonment exceeding one year, did knowingly possess a firearm, namely a Sig Sauer Model P320, 9mm semiautomatic handgun, and the firearm was in and affecting commerce.

In violation of Title 18, United States Code, Section 922(g)(1).

## ATTACHMENT B

I, Asadullah Kakar, am a Task Force Officer with the Drug Enforcement Administration. I am fully familiar with the facts set forth herein based on my own investigation, my conversations with other law enforcement officers, and my review of reports, documents, and items of evidence. Because this Affidavit is being submitted for a limited purpose, I have not set forth each and every fact that I know concerning this investigation. Where the contents of documents and the actions and statements of others are reported herein, they are reported in substance and in part, except where otherwise indicated. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

## BACKGROUND

1. On or about June 12, 2025, a confidential source ("CS-1"), working at the direction and supervision of law enforcement, was contacted on his/her cellphone via WhatsApp by an individual ("Individual-1") who stated that he could provide large quantities of narcotics to CS-1. Individual-1 further stated that his narcotics supply would take several days to be delivered to New Jersey, but that he had another contact in New Jersey who had immediate access to narcotics. Individual-1 subsequently stated that he would provide CS-1's phone number to that person.

2. CS-1 was contacted on his/her cellphone via WhatsApp by an individual, later identified as the defendant, HECTOR RIANO-CORCUERA ("RIANO-CORCUERA"), who stated that he was contacting CS-1 at the request of Individual-1, and that RIANO-CORCUERA understood that CS-1 was interested in purchasing narcotics. RIANO-CORCUERA proposed meeting CS-1 to discuss a potential narcotics transaction. CS-1, and another confidential source ("CS-2"), working at the direction and supervision of law enforcement, agreed to meet with RIANO-CORCUERA on June 14, 2025 at a restaurant (the "Restaurant") in or around East Brunswick, New Jersey.

## THE JUNE 14, 2025 MEETING

3. On or about June 14, 2025, law enforcement officers met with CS-1 and CS-2 at a predetermined briefing location to discuss the meeting at the Restaurant. Law enforcement officers searched CS-1 and CS-2 and the vehicle that they arrived in for contraband, currency, and weapons, which yielded negative results. CS-1 and CS-2 were each provided with a recording device to record the meeting.

4. Ahead of the meeting between CS-1, CS-2, and RIANO-CORCUERA, law enforcement officers established surveillance in the vicinity of the Restaurant. CS-1 and CS-2 proceeded directly from the briefing location to

4

the Restaurant in one vehicle. Law enforcement officers followed CS-1 and CS-2 from the briefing location to the Restaurant and maintained constant surveillance.

5. CS-1 and CS-2 proceeded directly to the Restaurant and CS-1 called RIANO-CORCUERA's cellphone number to advise that they had arrived. RIANO-CORCUERA answered the phone and advised that he was on his way to the Restaurant. At this time, law enforcement officers observed RIANO-CORCUERA exit a Mercedes-Benz Sedan (the "Mercedes") in an adjacent parking lot and walk towards CS-1 and CS-2's vehicle. A search of motor vehicle databases revealed RIANO-CORCUERA to be the registered owner of the Mercedes.

6. RIANO-CORCUERA met with CS-1 and CS-2 outside of their vehicle before the three proceeded into the Restaurant. Once inside, RIANO-CORCUERA stated that he obtains cocaine from California, and that he currently has 4.5 kilograms of cocaine but can obtain higher quantities in the weeks to follow. RIANO-CORCUERA further stated that he would sell CS-1 and CS-2 the cocaine at the price of $17,000 per kilogram, but that he would not sell all the product he has on-hand because of demand from his other "customers." RIANO-CORCUERA stated that he would drop the price to $16,500 per kilogram if CS-1 and CS-2 agreed to purchase 10 or more kilograms. CS-1 and CS-2 agreed to purchase one kilogram of cocaine from RIANO-CORCUERA at the price of $17,000.

7. After agreeing on the sale, RIANO-CORCUERA, CS-1, and CS-2 all exited the Restaurant. RIANO-CORCUERA entered the Mercedes and departed the area. Law enforcement observed RIANO-CORCUERA travel a short distance and pull into a driveway of a nearby residence (the "Residence"). A search of motor vehicle databases revealed that the Residence was the address associated with RIANO-CORCUERA's New Jersey driver's license and the registered address associated with the vehicle registration for the Mercedes.

8. CS-1 and CS-2 returned to their vehicle and departed the Restaurant while under constant surveillance. CS-1 and CS-2 arrived at a pre-determined debriefing location. There, law enforcement officers searched CS-1 and CS-2 and their vehicle for contraband, currency, and weapons, which yielded negative results. Law enforcement officers recovered the recording devices previously provided to CS-1 and CS-2 and processed them as evidence.

### THE JUNE 19, 2025 COCAINE DELIVERY

9. On or about June 18, 2025, RIANO-CORCUERA messaged CS-1 via WhatsApp and proposed meeting on June 19, 2025 in a parking lot at a mall in or around the East Brunswick area (the "Mall"). The purpose of this meeting was to complete the one-kilogram sale of cocaine as previously

5

discussed in the June 14, 2025 meeting, discussed above. CS-1 agreed to meet RIANO-CORCUERA at that time and place.

10. On or about June 19, 2025, law enforcement officers met with CS-1 and CS-2 at a predetermined briefing location to discuss the meeting at the Mall. Law enforcement officers searched CS-1 and CS-2 and the vehicles that they arrived in for contraband, currency, and weapons, which, other than the currency provided to CS-2 to complete the proposed transaction with RIANO-CORCUERA, yielded negative results. CS-1 and CS-2 were each provided with a recording device to record the meeting.

11. Ahead of the meeting between CS-1, CS-2, and RIANO-CORCUERA, law enforcement officers established surveillance in the vicinity of the Residence and the Mall. CS-1 and CS-2 proceeded directly from the briefing location to the Mall, each in their own vehicles. Law enforcement officers followed CS-1 and CS-2 from the briefing location to the Mall and maintained constant surveillance.

12. While en route to the mall, RIANO-CORCUERA called CS-1 and advised CS-1 to alert RIANO-CORCUERA when CS-1 was 10 minutes away from the Mall. Once CS-1 arrived at the Mall, he/she called RIANO-CORCUERA to advise him that he/she had arrived.

13. Law enforcement observed RIANO-CORCUERA exiting the Residence before entering the Mercedes and departing. RIANO-CORCUERA was wearing a black cross-body bag (the "Bag"). Law enforcement observed RIANO-CORCUERA drive the Mercedes a short distance from the Residence to the Mall and enter the Mall parking lot.

14. After the Mercedes arrived in the parking lot, RIANO-CORCUERA contacted CS-1 and stated that he was in the parking lot. CS-1 directed RIANO-CORCUERA to his/her location.

15. Law enforcement observed the Mercedes park between the vehicles belonging to CS-1 and CS-2. RIANO-CORCUERA exited the Mercedes and entered the front passenger seat of CS-2's vehicle. RIANO-CORCUERA then removed one kilogram of cocaine from the Bag and gave it to CS-2. After visually inspecting the cocaine, CS-2 gave RIANO-CORCUERA $17,000 in United States currency to complete the transaction. RIANO-CORCUERA placed the $17,000 in the Bag.

16. Following the transaction, law enforcement observed RIANO-CORCUERA exit CS-2's vehicle, enter the Mercedes, and depart the Mall parking lot. Law enforcement observed the Mercedes travel a short distance and park in the driveway of the Residence. Law enforcement then observed

RIANO-CORCUERA exit the Mercedes while wearing the Bag and enter the Residence.

17. CS-1 and CS-2 returned to their vehicles and departed the area while under constant surveillance. CS-1 and CS-2 arrived at a pre-determined debriefing location. There, law enforcement officers searched CS-1 and CS-2 and their vehicle for contraband, currency, and weapons, which, other than the cocaine provided by RIANO-CORCUERA to CS-2, yielded negative results. Law enforcement officers recovered the recording devices previously provided to CS-1 and CS-2 and processed them as evidence.

18. The cocaine delivered to CS-2 was field tested and confirmed positive for cocaine.

### **THE JUNE 26, 2025 COCAINE DELIVERY**

19. On or about June 21, 2025, CS-1 contacted RIANO-CORCUERA via WhatsApp to discuss another purchase of cocaine. RIANO-CORCUERA asked CS-1 how much cocaine he/she was looking for and CS-1 responded that he/she wanted 8, 10, or 12 kilograms. RIANO-CORCUERA stated that he could provide those quantities and that he would have it no earlier than June 26, 2025.

20. On or about June 24, 2025, RIANO-CORCUERA contacted CS-1 to ask what specific amount of cocaine he should put aside for CS-1 to purchase. CS-1 responded that he/she wanted 10 kilograms. CS-1 asked RIANO-CORCUERA when the transaction will occur, and RIANO-CORCUERA stated that it would be either June 25 or 26.

21. On or about June 25, 2025, CS-1 contacted RIANO-CORCUERA and asked if he was ready for their previously agreed upon transaction. RIANO-CORCUERA stated that he was ready "since yesterday." RIANO-CORCUERA asked CS-1 exactly how much cocaine he/she was looking to purchase. CS-1 informed RIANO-CORCUERA that if he has 10 kilograms to sell, then CS-1 will buy them.

22. On or about June 26, 2025, CS-1 contacted RIANO-CORCUERA and asked if he would be ready for their transaction that night. RIANO-CORCUERA stated that he would be ready between 6:00 p.m. – 7:00 p.m. During that conversation, CS-1 asked RIANO-CORCUERA about pricing and reminded him about their conversation at the Restaurant about a discount in pricing for purchasing higher quantities of cocaine. RIANO-CORCUERA responded with "16 and-a-half," to which CS-1 agreed.[1] RIANO-CORCUERA

---

[1] Based on my training and experience, I know that "16 and-a-half" means $16,500 per kilogram.

7

informed CS-1 that they would conduct the transaction at the Mall parking lot, the same general location as the June 19, 2025 transaction.

23. On or about June 26, 2025, law enforcement officers met with CS-1 and CS-2 at a predetermined briefing location to discuss the meeting at the Mall. Law enforcement officers searched CS-1 and CS-2 and the vehicles that they arrived in for contraband, currency, and weapons, which, other than the imitation currency provided to CS-2 to complete the proposed transaction with RIANO-CORCUERA, yielded negative results. CS-2 was provided with a recording device to record the meeting.

24. Ahead of the meeting between CS-1, CS-2, and RIANO-CORCUERA, law enforcement officers established surveillance in the vicinity of the Residence and the Mall. CS-1 and CS-2 proceeded directly from the briefing location to the Mall, each in their own vehicles. Law enforcement officers followed CS-1 and CS-2 from the briefing location to the Mall and maintained constant surveillance.

25. Law enforcement observed RIANO-CORCUERA exit the Residence holding a reusable-style shopping bag (the "Shopping Bag"). Officers observed RIANO-CORCUERA place the Shopping Bag into the Mercedes and depart the Residence. Law enforcement observed RIANO-CORCUERA enter the Mercedes and drive to the Mall parking lot.

26. After he arrived, RIANO-CORCUERA sent CS-1 a photograph of where RIANO-CORCUERA was parked. Based on the photograph, CS-2 drove his/her vehicle to that location. Law enforcement observed RIANO-CORCUERA enter CS-2's vehicle's front passenger seat with the Shopping Bag. Once inside the vehicle, RIANO-CORCUERA placed the Shopping Bag on the interior console and took out packages of what was presented as cocaine. CS-2 inspected the packages before exiting the vehicle to gather the imitation currency as payment for RIANO-CORCUERA, which was stored in the trunk.

27. Before CS-2 could access the imitation currency, law enforcement officers approached the vehicle and identified themselves. RIANO-CORCUERA then exited the vehicle and fled on foot. During his flight, law enforcement officers observed RIANO-CORCUERA throw away his cellphone. Once officers apprehended RIANO-CORCUERA, they recovered a loaded Sig Sauer Model P320, 9mm semiautomatic handgun (the "Handgun") from a cross-body bag that was secured across his chest. The Handgun had an obliterated serial number.

28. RIANO-CORCUERA was read his *Miranda* rights and waived them in writing. He informed law enforcement officers that he resided at the Residence, along with multiple other people. He further informed law

enforcement officers that there are multiple firearms, marijuana, and additional quantities of cocaine inside the Residence.

29. The contents of the packages delivered to CS-2 were field tested and confirmed positive for cocaine. The contents weighed at least 10 kilograms.

30. On June 26, 2025, the Honorable Justin T. Quinn, United States Magistrate Judge, authorized a search warrant for the Residence. See 25-mj-6051 (JTQ).

31. As a result of the search warrant, law enforcement officers recovered from the Residence, among other things, approximately 200 grams of cocaine, two semiautomatic rifles, three handguns, and various firearm ammunition.

32. A review of RIANO-CORCUERA's criminal history reveals that on or about June 14, 2019, RIANO-CORCUERA pleaded guilty in the Superior Court of New Jersey, Middlesex County, to third-degree possession of a controlled dangerous substance, in violation of N.J.S.A. § 2C:35-10(a)(1), second-degree possession of a controlled dangerous substance with intent to distribute, in violation of N.J.S.A. § 2C:35-5(a)(1), and third-degree possession of a controlled dangerous substance with intent to distribute within 1,000 feet of school property, in violation of N.J.S.A. § 2C:35-7(a), all of which are crimes punishable by a term of imprisonment exceeding one year. On or about December 6, 2020, RIANO-CORCUERA was sentenced on these charges to a 90-day term of imprisonment and five years of probation.

33. The Handgun recovered from RIANO-CORCUERA was manufactured outside of the State of New Jersey, and, therefore, had traveled in commerce prior to its recovery on June 26, 2025. In addition, the Handgun was examined by law enforcement and determined to meet the definition of a "firearm" because it will or is designed to or may readily be converted to expel a projectile by the action of an explosive.